# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| In the Matter of the Parental Rights to A.R.D.L., | No. 50132-5-II |
| Minor Child. | UNPUBLISHED OPINION |

LEE, J. — J.I. appeals the termination of his parental relationship with A.R.D.L. pursuant to Washington's adoption statute, Title 26.33 RCW.  He argues that termination of his parental relationship violated his equal protection rights because he was not afforded the same remedial services or process as parents facing termination in dependency cases.  He also argues that the adoption termination process violated substantive due process because it infringed his fundamental right to parent without requiring a showing of harm to the child.  We affirm.

FACTS

A.    BACKGROUND

J.I. is the biological father of A.R.D.L., born in 2006, in Longview, Washington.  J.I. has struggled with a heroin addiction since 2007.

In April 2010, J.I. and A.R.D.L.'s biological mother, S.D., were arrested for drug crimes.[1]  On the day of their arrest, S.D.'s grandmother (A.R.D.L.'s great-grandmother) was at the house.

---

[1] The exact nature of these charges is unclear from the record.  However, the record shows that J.I. was sentenced for three violations of the Uniform Controlled Substances Act on July 6, 2010.

As the arresting officers prepared to take S.D. and J.I. into custody, S.D. signed a notarized document granting her grandmother, J.L., temporary custody of A.R.D.L. J.I. never signed this temporary custody document. At the time, A.R.D.L. was three years old.

A.R.D.L. has resided with her great-grandparents, J.L. and T.L., on a continuous basis since April 2010. On July 21, 2011, the superior court entered a nonparental custody decree, awarding J.L. and T.L. third party custody of A.R.D.L. under RCW 26.10.040.[2] The order also suspended J.I. and S.D.'s contact with A.R.D.L. until they could demonstrate to the court: (1) at least 12 months of documented sobriety, (2) maintenance of a stable residence and employment for at least 12 months, (3) successful completion of "after care as recommended by the treatment provider," (4) compliance with the Department of Corrections, and (5) evidence of a positive network of clean and sober friends and associates. Clerk's Papers (CP) at 129. Both J.I. and S.D. agreed to the order. J.I. never complied with the superior court's conditions to reinstate visitation with A.R.D.L.

On February 16, 2016, J.L. and T.L. filed a petition for termination of J.I. and S.D.'s parental relationship under RCW 26.33.120[3] so that they could adopt A.R.D.L. S.D. consented to termination of her parental relationship with A.R.D.L. J.I. withheld his consent.

---

[2] RCW 26.10 governs nonparental actions for child custody. A party seeking custody under RCW 26.10 must submit a motion and supporting affidavit "declaring that the child is not in the physical custody of one of its parents or that neither parent is a suitable custodian and setting forth facts supporting the requested order." RCW 26.10.032.

[3] RCW 26.33.120(1) allows for termination of a parent-child relationship if the court finds by clear, cogent, and convincing evidence that it is in the child's best interests to terminate the relationship and that the nonconsenting parent has "failed to perform parental duties under circumstances showing a substantial lack of regard for his or her parental obligations and is withholding consent to adoption contrary to the best interest of the child."

B.    TERMINATION TRIAL[4]

At trial on the petition for termination of J.I.'s parental relationship with A.R.D.L., J.I.

testified that he had spent approximately four to five of the last 10 years in jail or prison. Most

recently, in November 2015, J.I. pleaded guilty to possession of heroin and unlawful possession

of a dangerous weapon  His criminal history showed six other felony drug convictions dating back

to 2009.

J.I. was placed on the Drug Offender Sentencing Alternative program (DOSA)[5] following

his November 2015 felony drug conviction. He was removed from the program in November 2016

after attempting to alter a uranalysis test and admitting to continued heroin use. J.I. enrolled in

drug treatment the week before trial, but had not yet attended a treatment session.

J.I. also testified that he had been unable to maintain a stable residence or employment for

more than one year. At the time of trial, J.I. was staying at his grandmother's house. Between

April 2010 and February 2017, J.I. provided less than $1,000 of financial support to A.R.D.L.

Following the entry of the 2011 nonparental custody decree, J.I contacted A.R.D.L. twice—a

chance meeting at a store that lasted approximately two minutes and a five to six minute phone

call.

---

[4] The trial court appointed the office of public defense to represent J.I. during the termination proceedings.

[5] Passed in 1995, DOSA provides an alternative to incarceration for felony offenders with substance abuse problems. *Program Profile: Washington State's Residential Drug Offender Sentencing Alternative*, NATIONAL INSTITUTE OF JUSTICE (Nov. 10, 2015), https://www.crimesolutions.gov/ProgramDetails.aspx?ID=436. Offenders eligible for DOSA may volunteer to receive chemical dependency treatment at a Washington State Department of Corrections-funded residential facility, but if they fail to complete treatment, are returned to confinement to serve the remainder of their sentence. *Id.*

The trial court found J.I. unfit to parent A.R.D.L., as he had failed to complete any of the tasks ordered in the 2011 nonparental custody decree, including remaining clean and sober. The trial court ruled that J.I. had failed to perform his parental duties under circumstances showing a substantial lack of regard for his parental obligations. The court also ruled that it was in the best interests of A.R.D.L. to terminate J.I.'s parental rights and allow J.L. and T.L. to adopt A.R.D.L.

The trial court entered an order terminating J.I.'s parental rights. J.L. and T.L. subsequently adopted A.R.D.L. J.I. appeals

## ANALYSIS

A.    EQUAL PROTECTION

J.I. argues that termination of his parental relationship pursuant to Washington's adoption statute violated equal protection because (1) the adoption statute did not require the State to provide remedial services to cure his parental deficiencies prior to termination; and (2) the adoption statute allowed for termination under a "much lower standard" than required by the dependency statute. Br. of Appellant at 6. We disagree.

1.    Legal Principles

Constitutional challenges are questions of law that we review de novo. *City of Redmond v. Moore*, 151 Wn.2d 664, 668, 91 P.3d 875 (2004). Because statutes are presumed to be constitutional, the party challenging the statute bears the burden of establishing the statute's unconstitutionality. *In re Interest of Infant Child  Skinner*, 97 Wn. App. 108, 114, 982 P.2d 670 (1999).

The equal protection clauses of the Fourteenth Amendment of the United States Constitution and art. 1, section 12 of the Washington Constitution guarantee that "persons similarly

situated with respect to the legitimate purpose of the law receive like treatment. " *Harmon v. McNutt*, 91 Wn.2d 126, 130, 587 P.2d 537 (1978). In evaluating an equal protection claim, we must first determine whether the individual alleging the violation is similarly situated to other persons. *State v. Osman*, 157 Wn.2d 474, 484, 139 P.3d 334 (2006). "Where persons of different classes are treated differently, there is no equal protection violation." *Forbes v. City of Seattle*, 113 Wn.2d 929, 943, 785 P.2d 431 (1990).

2.       J.I. was not Similarly Situated to Parents Subject to Dependency Termination

J.I. argues that he was similarly situated to parents facing termination through dependency proceedings because A.R.D.L. was removed from her parents under circumstances similar to a "typical" dependency termination case. Br. of Appellant at 9. We disagree.

Equal protection does not require that all persons be treated identically, but it does require any classification to be relevant to the purpose for the disparate treatment. *Osman*, 157 Wn.2d at 484. Whether two persons are similarly situated is determined with respect to the legitimate purpose of the law. *State v. Manussier*, 129 Wn.2d 652, 672, 921 P.2d 473 (1996), *cert. denied*, 520 U.S. 1201 (1997).

In a dependency proceeding, the State controls the custody and care of a child following an adjudication of abandonment, abuse, or neglect. *Skinner*, 97 Wn. App. at 117. A dependency proceeding may begin when the Department of Social Health Services (DSHS) files a petition alleging that a child is "dependent" under RCW 13.34.030. RCW 13.34.040(1)[6] A "dependent

---

[6] RCW 13.34.040 has been amended since the events of this case transpired. However, the amendments do not materially affect the statutory language relied on by this court. Accordingly, we refrain from including the word "former" before RCW 13.34.040(1).

child" is defined as a child who has (1) been abandoned; (2) abused or neglected by a person legally responsible for caring for the child; (3) has no parent, guardian, or custodian capable of providing adequate care; or (4) is receiving extended foster care services. RCW 13.34.030(6)(a)-(d).[7] If a court finds reasonable grounds to believe that a child is dependent and that his or her health, safety, and welfare are seriously endangered, the court may order law enforcement or an official with the Child Protective Services to remove the child from the home. RCW 13.34.050(1)(c).

Once removed, the child is immediately placed in shelter care.[8] RCW 13.34.060(1). Within 72 hours, the court must hold a shelter care hearing to determine whether the child may be safely returned to the home. RCW 13.34.065(1)(a).[9] A dependency fact-finding hearing must be held within 75 days of the dependency petition being filed. RCW 13.34.070(1). If the child is found to be dependent following the fact-finding hearing, then legal custody is transferred to the State. *In re Dependency of Schermer*, 161 Wn.2d 927, 942, 169 P.3d 452 (2007).

The court may then order the child remain in his or her home under a "program designed to alleviate the immediate danger to the child" and to aid the parents in preventing future

---

[7] RCW 13.34.030 has been amended since the events of this case transpired. The amendments also do not materially affect the statutory language relied on by this court. Accordingly, we refrain from including the word "former" before RCW 13.34.030.

[8] Shelter care is temporary physical care in a licensed facility or in a home that does not require State licensing pursuant to RCW 74.15.030. Former RCW 13.34.030(18) (2013).

[9] RCW 13.34.065 has been amended since the events of this case transpired. The amendments also do not materially affect the statutory language relied on by this court. Accordingly, we refrain from including the word "former" before RCW 13.34.065.

endangerment. RCW 13.34.130(1)(a).[10] Under this disposition, the court chooses services to assist the parents in keeping the child in the home, including housing assistance. RCW 13.34.130(1)(a). Alternatively, the court may order the child be removed from his or her home and placed into the custody, control, and care of a relative, other suitable person, or DSHS. RCW 13.34.130(b)(i). The department or supervising agency also has authority to place the child, subject to court approval, with a relative or in the home of a family with which the child has a preexisting relationship. RCW 13.34.130(b)(ii).

The purpose of the dependency process is to mend and preserve family ties through State intervention. Kathleen Haggard, *Treating Prior Terminations of Parental Rights As Grounds for Present Terminations*, 73 WASH. L. REV. 1051, 1059 (1998). The process allows the court to order reunification and remedial services meant to address the circumstances that prompted State intervention. *Skinner*, 97 Wn. App. at 117. If the case proceeds to a termination trial, the State must produce clear and convincing evidence that: (1) the child has been found dependent, (2) the court has entered a dispositional order declaring the child dependent, (3) the child has been removed from parental custody for at least six months pursuant to a dependency finding, (4) the parent has been offered or provided with necessary remedial services, capable of correcting the parental deficiencies within the foreseeable future, (5) there is little likelihood that the conditions leading to removal will be remedied to allow the child to return home in the near future, and (6)

---

[10] RCW 13.34.130 has been amended since the events of this case transpired. The amendments also do not materially affect the statutory language relied on by this court. Accordingly, we refrain from including the word "former" before RCW 13.34.130.

continuation of the parent child relationship "clearly diminishes the child's prospects for early integration into a stable and permanent home." RCW 13.34.180(1)(a)-(f).[11]

In contrast, Washington's adoption statute does not provide for State intervention. *See* RCW 26.33.080(2); RCW 26.33.120(1); *Skinner*, 97 Wn. App. at 117-18. The purpose of the adoption process "is to provide stable homes for children." RCW 26.33.010. The adoption statute is intended to protect the best interests of the child. RCW 26.33.010; *In re Adoption of Baby Girl K*, 26 Wn. App. 897, 905, 615 P.2d 1310 (1980), *review denied* 95 Wn.2d 1003 (1981).

The focus in a termination proceeding under the adoption statute is whether there is a showing by clear, cogent and convincing evidence that termination of the parental relationship is in the child's best interests and that the "parent has failed to perform parental duties under circumstances showing a substantial lack of regard for his or her parental obligations." RCW 26.33.120(1). Thus, while both the adoption and dependency statutes provide for termination of parental rights, "there is a substantial difference in the nature of the governmental function under each statutory scheme." *Skinner*, 97 Wn. App. at 117. For this reason, in *Skinner*, Division One of this Court held that a parent whose parental rights are terminated through adoption proceedings is not similarly situated to a parent whose rights are terminated through dependency proceedings. *Id.* at 117-18.

J.I. urges us to reject the *Skinner* court's holding and instead hold that J.I. was similarly situated to parents facing termination in a dependency action. According to J.I., *Skinner* was

---

[11] RCW 13.34.180 has been amended since the events of this case transpired. The amendments also do not materially affect the statutory language relied on by this court. Accordingly, we refrain from including the word "former" before RCW 13.34.180.

wrongly decided, applied the wrong standard of review, and is distinguishable from the facts of this case. We disagree and follow the *Skinner* court's holding.

J.I. argues that *Skinner* was wrongly decided because whether a parent faces termination brought by the State or through one parent's decision to relinquish his or her child is "a meaningless distinction." Br. of Appellant at 12. J.I. believes this distinction to be meaningless because in either circumstance, his child was taken away. He also argues that his case is identical to a "typical" dependency case except for the "chance circumstance[]" that A.R.D.L.'s great-grandmother happened to be present on the day of his arrest. Br. of Appellant at 9.

The presence of a relative willing to care for A.R.D.L. on the day of J.I.'s arrest does not distinguish the circumstances here from a dependency proceeding. Rather, J.I.'s case differs from a dependency proceeding because the State never placed itself between J.I. and A.R.D.L. The State never used its power and resources to exercise control over the custody and care of A.R.D.L. And the State never initiated a termination petition in which the State sought to permanently sever J.I.'s parental relationship.

Here, the adoption proceeding commenced when A.R.D.L.'s biological mother voluntarily consented to adoption by A.R.D.L.'s great-grandparents. Unlike in a dependency proceeding, J.I. never faced the use of State power and resources to remove A.R.D.L. from his home, require him to correct perceived deficiencies, and if unsuccessful, to terminate his relationship with A.R.D.L. Therefore, J.I. faced a different set of circumstances than a parent facing termination through State intervention.

J.I. argues that the *Skinner* court erred because it explicitly recognized that the adoption statutes and dependency statutes share the same purpose—protection of the safety and welfare of

the child. However, the *Skinner* court clarified that the statutes share this same compelling purpose only "when viewed broadly." 97 Wn. App. at 117. The *Skinner* court then detailed the "substantial difference in the nature of the governmental function under each statutory scheme." *Id.* Because the government function varied drastically under each statutory scheme, the court held that parents in these different proceedings were not similarly situated with respect to the legitimate purpose of the law. *Id.* at 117-18.

As to the applicable standard of review, the *Skinner* court did not need to evaluate the father's equal protection claim under strict scrutiny because the father failed to show he was similarly situated to parents facing dependency termination. "Where persons of different classes are treated differently, there is no equal protection violation." *Forbes*, 113 Wn.2d at 943.

J.I. argues that the facts here are distinguishable because in *Skinner*, there was no indication that the State could have initiated dependency proceedings, whereas A.R.D.L.'s removal was nearly identical to a "typical" dependency case. Br. of Appellant at 13. To this point, there is no "typical" dependency case. The specific circumstances prompting State intervention in a parent-child relationship vary case by case. *See e.g.*, *In re Parental Rights to M.J.*, 187 Wn. App. 399, 402, 348 P.3d 1265 (children taken into custody at the time of mother's arrest); *In re Dependency of M.P.*, 185 Wn. App. 108, 111, 340 P.3d 908 (2014) (child removed from parents' custody due to allegations of neglect); *In re Dependency of Ca.R.*, 191 Wn. App. 601, 605, 365 P.3d 186 (2015) (child removed from mother's custody after child reported sexual abuse by mother's boyfriend); *In re Welfare of Aschauer*, 93 Wn.2d 689, 691, 611 P.2d 1245 (1980) (children placed in protective custody after their father abandoned them in a motel). Indeed, in a dependency action, the court tailors the required remedial services to address the specific circumstances that prompted State

intervention in a parent child relationship. RCW 13.34.130(1)(a), (b)(i)-(b)(ii); *Skinner*, 97 Wn. App. at 117. What each dependency case does share in common is the use of State resources to control the care and custody of a child. Therefore, J.I.'s notion that the circumstances of A.R.D.L.'s removal represented a "typical" dependency case is unpersuasive.

Moreover, the facts of *Skinner* are not materially distinguishable. Both here and in *Skinner*, the proceedings began when the biological mother voluntarily relinquished her parental rights to her child. Also, as in *Skinner*, the State never sought to terminate J.I.'s parental relationship with A.R.D.L.

Because J.I. was not similarly situated to parents facing termination through dependency, there is no equal protection violation. *See Forbes*, 113 Wn.2d at 943. Therefore, we need not address whether a compelling State interest justified disparate treatment of similarly situated persons.

B. SUBSTANTIVE DUE PROCESS

J.I. argues that the termination provision in the adoption statute violates substantive due process because it allows for termination of his fundamental right to parent without requiring a showing that termination was necessary to prevent harm to the child. We disagree.

1. Legal Principles

A parent's right to raise his or her children free of State interference is a fundamental liberty interest protected by the Due Process Clause of the Fourteenth Amendment. *In re Custody of Smith*, 137 Wn.2d 1, 15, 969 P.2d 21 (1998), *aff'd*, 530 U.S. 57 (2000). We review substantive due process challenges de novo. *In re Adoption of K.M.T.*, 195 Wn. App. 548, 559, 381 P.3d 1210 (2016), *review denied*, 187 Wn.2d 1010 (2017).

2.      The Adoption Statute Does not Violate Due Process

Washington's adoption statute allows a prospective adoptive parent to petition for the termination of the biological parent's parent-child relationship.  RCW 26.33.100(1)(b).  Under RCW 26.33.120(1), the parent-child relationship:

> [M]ay be terminated upon a showing by clear, cogent, and convincing evidence that it is in the best interest of the child to terminate the relationship and that the parent has failed to perform parental duties under circumstances showing a substantial lack of regard for his or her parental obligations and is withholding consent to adoption contrary to the best interest of the child.

Thus, the threshold issue under RCW 26.33.120 is whether the parent " 'has failed to perform parental duties under circumstances showing a substantial lack of regard for his or her parental obligations.' "  *K.M.T.*, 195 Wn. App. at 558 (quoting RCW 26.33.120(1)).  Absent a judicial determination that a parent is unfit to raise his or her child, termination of parental rights violates due process.  *In re H.J.P.*, 114 Wn.2d 522, 531, 789 P.2d 96 (1990).

In *H.J.P.*, our Supreme Court held that in order for a court to terminate the parental rights of a nonconsenting parent pursuant to Washington's adoption termination statute, the court "must find parental unfitness on the part of the nonconsenting parent."  *Id.*  Because the *H.J.P.* court "indicated that compliance with the statutory requirements [of RCW 26.33.120] satisfied due process," this court recently rejected a challenge that substantive due process also requires a showing of harm to the child.  *K.M.T.*, 195 Wn. App. at 560.  As we explained in *K.M.T.*, our Supreme Court never referenced a required showing of harm to the child in deciding *H.J.P.*  *Id.* at 564.  And RCW 26.33.120.120(1) does not impose such requirement.  *Id.*

J.I. argues that we should reverse our holding in *K.M.T.* because it is both incorrect and harmful.  J.I.'s sole argument for overruling our prior holding is: "*K.M.T.* was wrongly decided

and is harmful because it permits the continued violation of parents' constitutional rights without affording substantive Due Process. That case should be overruled." Br. of Appellant at 18-19.

We do not " 'lightly set aside precedent.' " *State v. Stalker*, 152 Wn. App. 805, 810, 219 P.3d 722 (2009) (quoting *State v. Kier*, 164 Wn.2d 798, 804-05, 194 P.3d 212 (2008)), *review denied* 168 Wn.2d 1043 (2010). We will only overrule established precedent upon a showing that such precedent is both demonstrably incorrect and harmful. *Lunsford v. Saberhagen Holdings, Inc.*, 166 Wn.2d 264, 278, 208 P.3d 1092 (2009); J.I. cites to no authority or subsequent holding of our Supreme Court which would undermine our reasoning and holding in *K.M.T.* Thus, we follow our holding in *K.M.T.* and hold that due process does not require a finding that the child would be harmed if parental rights are terminated pursuant to RCW 26.33.120(1).

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

I concur:

Worswick, J.

Maxa, C.J.